May it please the Court, good morning, I'm Matt Adams with Northwest Immigrant Rights Project. On behalf of the petitioner, Mr. Garfias, and I'll seek to preserve five minutes for rebuttal. This Court's decision in Acosta first clarified the rule as to the interplay between the two statutes at issue. And this rule governed all pending cases. Accordingly, the Board, when Mr. Garfias was first before the Board on appeal, found that he was eligible for adjustment and remanded to give him an opportunity to apply. So it was decided after your client filed his petition, his petition for adjustment? That's correct, my client... And it was decided after he got the grounds for adjustment, right? Adjustment is based on... The petition that was filed by his citizen wife. So he didn't rely on Acosta in either getting married or filing the petition, right? Certainly he individually didn't rely on Acosta when he first filed his application in 2002 or when he was first placed in removal proceedings in 2004. But after the Board remanded it, giving him the opportunity, and he renewed his application, submitting additional application, paying additional application fees and attorney's fees, there was explicit reliance. What possible reliance interest can he have in Acosta if everything he did or didn't do and everything, you know, his application and all those things were completed before Acosta? There's two points to that. In the reliance discussion, since we're creating a uniform rule, we look at litigants in general. There certainly are... Well, I understand, and you want to talk about something else. I'm asking you the question about your client. If the answer is nothing for my client, but let's talk about somebody else, that's fine. But why don't you start by answering my question? What reliance interest would your client have had in Acosta, given that Acosta was decided four years after he filed his petition, after he got married? That's correct. But when the Board remanded his case back in front of the immigration judge, he submitted additional applications, paid additional fees. He paid additional fees to his attorney following six hearings, all in reliance on the Board's determination that he would be eligible to apply for adjustment of status. Is he seeking refund of those fees? Is he seeking refund? I really don't understand how the reliance connects up with the relief he's seeking. The relief he's seeking is adjustment of status. The law that governed at that time, the court's ruling in Acosta, declaring the rule from its inception was that he was eligible for adjustment, and it covered all pending cases, including his. And so he was able to move forward with Acosta, affording him this opportunity for adjustment. He qualified under the pending law, was able to continue moving forward with his application. In fact, the second time when his application was denied was on a separate basis. It was only when it was back before the Board that it determined that it would change its position, relying on Brand X. And at that point, it decided, in his case, it would not follow Acosta. Now, while Brand X provides the agency. Well, I sort of missed your answer to this question a little bit. I didn't understand it. So you're not seeking a refund of the fees. You're seeking some other kind of relief. And I didn't hear the answer to Judge Clifton's question, which is how does the relief your client seeks match up with the prejudice or the reliance interest that he. He got married. All the stuff he did in real life. It's not like somebody enters a plea in a reliance on a case law, and then it turns out that it's changed. They say, wait a minute, I wanted my trial because I relied on the case law. He got married. That happened. He filed a source petition. And now he's claiming the reliance interest, his own personal reliance interest, some attorney's fees and some filing fees. Yes. He's claiming reliance and other equitable concerns. Under the law, as clarified in Acosta, he had the opportunity to qualify for adjustment and remain here with his family. And so in his case, he didn't initially file an application in explicit reliance on Acosta like other parties. But he had the benefit of the law as it was declared, the judicial interpretation declaring the law from its inception that governed all parties. And certainly there's no mechanism to return it. Well, that's a happy circumstance for him if it lasts, but that's different from reliance. You know, law changes, you say, oh, God, you know, I rely, you know, this is bad law. Suddenly there's new good law, and, you know, they're happy about it. But that's not the stuff of reliance, is it? Not precisely as far as the initial application. But I would note that even when he initially filed, there was no rule stating that he was ineligible. In fact, you just had the life enactment renewing. But you can hardly rely on a non-law, on ambiguity, the fact that two statutes that create an uncertainty in the law. I think it's the best we can say for him. It was unclear. He had a shot at well interpretation. But that's not a reliance. You wouldn't count that as relying on anything, right? I would agree that explicit reliance only kicks in once the court had clarified the law in Acosta. And after that point, when the board remanded the case, allowing him the opportunity to renew his application and move forward on that. And while the relief he's seeking is adjustment, the relief is not a return of the fees that he's paid. There's no mechanism for returning fees. It still creates a penalty to now change the law that applied to him. Just so I understand, what fees were these? That he submitted subsequent to Acosta. So, for example, he had to renew the I-693, the medical examination form which requires, and then he had to renew his I-864, although there's no fee with that form. So he paid additional fees, additional attorney's fees, all of this as he moved forward with the adjustment application. I-63 is necessary in order to process the adjustment application? I'm sorry? I-63 is necessary. That's right. The I-693 is the necessary component of the adjustment application. And it expires? And it expires. Yes, and so he had that and other forms that expired he had to renew and resubmit. And in addition, the test looking at whether retroactivity creates an undue impact on parties doesn't specifically focus on reliance alone. Reliance is one factor, but it looks at other equitable concerns. It's a big factor. It's a very big factor, yes, but there are other equitable concerns. And, in fact, in Volartales, the Supreme Court's most recent decision, again, clarified that reliance alone isn't a basis for finding, the absence of reliance isn't a basis for finding that it shouldn't be retroactively applied, obviously in a separate context there. But here there's also other equitable concerns that need to be addressed, and that is that Congress, in renewing the Life Act, or in the Life Act, renewing the 245-I provision specifically provided an opportunity for those individuals who had entered without inspection to have the one opportunity to remain here with their family members. And it laid out a framework that at best is declared unclear whether this competing framework should take precedence over the more rigid structure that was implemented in IRIRA. And what Congress did in renewing that was providing one last opportunity for those individuals who now, under this new structure, don't have the opportunity and face indefinite separation from their family members. And Mr. Garfias and other similarly situated parties faced a tremendous burden. And I would cite back to this Court's decision in Miguel Miguel, where they are looking at the retroactivity analysis and the undue burden on parties, or say that deportation alone is a severe burden that would weigh against retroactivity. These are all factors that are considered beyond simply reliance. The new interpretation applied to Mr. Brionis, right? I'm sorry? Mr. Brionis. It applied to him. In Mr. Brionis' case, out of the Fifth Circuit, yes, they applied a new interpretation. But it applied as to him, as to Brionis. As to Mr. Brionis, yes. All right. And how is Mr. Brionis situated differently from your client? Because there was no – in Mr. Brionis' case, the Board was interpreting the rule in the absence of a clear prior rule. In the Fifth Circuit, there was no rule. And – well, actually, there was even a Fifth Circuit case, Mortera, where the Board agreed with the Fifth Circuit's analysis and found that he was ineligible. So there was no – I mean, that's the fundamental point, is that here in – So there was no change in law in the Fifth Circuit? There was no change in law. Here in the Ninth Circuit, for all cases pending in the Ninth Circuit, Acosta governed. What sense does it make to treat Brionis worse than your client? If you're talking about sort of classes and – neither of them relied on anything. Both of them filed applications when there was no law. So why should your client get a windfall when poor Brionis is out of luck? There's – or there's – in our current setup, there's necessarily interpretations of law that are different throughout the circuits. As brand acts aside, this happens on a regular basis. The law in this circuit was that Mr. Garfious was eligible for adjustment. At one point – not at the point he applied, not at the point he did the real-world conduct that gave him a particular adjustment. So it's not anything happened. It just happened somewhere along the way. There was a change in law, a temporary change in law that happened to benefit him. If – What sense is it to say, okay, now that we know that was wrong, he gets the benefit of that wrong law anyway? If the Board had announced its rule in the absence of a clear prior rule, then we wouldn't have an argument that it should not be applied retroactively to cover him. But given that Acosta announced the rule and governed all cases pending from the inception of this law, Acosta was the law that governed Mr. Garfious' case. And under the system that we have here, Mr. Garfious is entitled to understand the law and have his application adjudicated according. Now, you might say, yeah, before – Suppose the Supreme Court reversed? If the Supreme – Same set of facts, but it was the Supreme Court rather than the BIA that subsequently made a decision that caused our panel decision no longer to be valid. Would you maintain that position still? No, because I think that places it under a very different framework. And I think this is where Morales is – Also, how is it different? Because I think in that case, we're talking about a superior court reversing an inferior court. But more importantly, we're talking about – I know that's a difference, but why – But more importantly – I think that just clips this question. Why should that make a difference? More importantly, the superior court is correcting an error of the lower court. And this is the fundamental difference in the Brand X scenario. See, there are times, a lot of criminal habeas cases, for example, we have a doctrine that says if somebody actually relied upon our case law, even if the Supreme Court later says we're wrong, they can show a detrimental reliance. We will grant equitable tolling in an appropriate case, for example. But I don't see how that fits here, because your client really didn't do anything, didn't worsen his position, save the expenditure of fairly limited amounts of money, in reliance upon anything we did. But he was counting upon a given legal interpretation, which turned out to be incorrect, whether it was incorrect by virtue of the Supreme Court or by virtue of the subsequent BIA interpretation and the application of Brand X. I'm not sure why that makes a difference. In Brand X, the Supreme Court made clear that the Court of Appeals' prior interpretation is not legally wrong. And it's not correct to say that the agency or the court is reversing that prior interpretation. Yes, the agency has the prerogative to choose an alternative construction of the statute. But unlike the Harper and Rivers framework, you are not correcting an error in that prior interpretation. Simply, rather, the Supreme Court has carved out space to allow the agency to apply its expertise and fill the gaps with an alternative construction. This is no different than the fact that the agency, if it's already provided an interpretation, like in McGill, McGill, and Chang, may then later come back with a different interpretation. And given that the agency is the one that has the prerogative to change an interpretation, not based on an error, but simply because applying its expertise, it's determined that it's most appropriate for the framework, it requires a retroactivity analysis to see if those parties have already acted prior to the change in the law, should have an opportunity to rely on that settled law, and shouldn't be granted fair notice of any change. I mean, this is what... Counselor, what standard are you drawing upon? Are you looking to Montgomery Ward? Are you looking to Chevron Oil? Or are you indifferent as to which of those formulations one would apply? I think the Montgomery Ward context or test adequately addresses Brand X's scenario. I don't think that it's necessary that absolutely... I recognize that Brand X creates a new paradigm and that there could be some tweaking. I mean, the difference between the Chevron Oil test and the Montgomery Ward test is not all that great, with, of course, the big exception, which is the standard presumption against retroactivity in Chevron Oil. But I think if you go through the Chevron Oil factors in the Brand X scenario, you're recognizing that there's necessarily been an abrupt departure from the prior law, that it's overturned clear precedent. And moreover, the reason that it's overturned clear precedent is not because the prior rule was wrong, but rather because the agency now has the authority, if it so chooses, to offer an alternative construction. And, you know, I'd emphasize this point. The agency may choose an alternative construction, but unless and until it does, this Court's interpretation remains binding rule. So both Chevron Oil and Montgomery... What is your basis for saying that this is a retroactive application at all? Why is this a retroactive application? It's retroactive application law because it's impairing Mr. Garfious's eligibility to apply for a benefit for which he previously qualified. There's no question that when he went before the Board the first time that he was eligible for adjustment. The law clearly stated that under ACOSTA that he was eligible for adjustment. The new rule, if it's accepted by this Court, attaches new consequences and new liability. It precludes him from moving forward with his adjustment and being eligible. Was any time the law changed somewhere in the midst of litigation, does that become retroactive? I know it's not retroactive. No, it's not any time the law changed. Retroactively applied meant it applies to conduct that was taken in reliance on earlier law. I've never understood retroactive. If things ratchet up during the litigation, it's retroactive to apply to you even though it gets changed before the end of the litigation. It applies to actions that are completed. And this includes not just... What was completed here? Actions that are completed, you have him formally applying for adjustment of status. Even before ACOSTA created the law, he still took these actions. And then ACOSTA declared the law from its inception. And then after ACOSTA, he, again, further pursued that by renewing his application before the Board, paying thousands of dollars in fees. And while those fees might seem, in some perspective, limited, for my client, Mr. Garfield, and many similarly situated petitioners, those were their life savings, putting together everything they could to take advantage of the one opportunity that Congress gave them to remain together with their family members. And this is the underlying principle is that I think that... I've never heard the case where the reliance was based on attorney's fees spent during the course of litigation. It's a novel theory. I'm not sure it's wrong. I'm just not a member of a senior case like that. I think there's a lot of cases... I think retroactivity is judged by the fact that you keep on struggling. You've got a case that sort of lets you keep on struggling in litigation rather than putting a merciful end to it sooner. Well, I think if you look at a case like in a separate but related sphere, like a Landgraft or Hughes, you have Landgraft or Hughes, you have the court planning a retroactive analysis, basing the retroactive analysis on the fact that it increases liability for past conduct. And that could be... Increasing liability for past conduct is quite different from saying you've extended the litigation and so now you have to spend more money on your lawyer. I mean, they are different. You have a case. I've just never heard of it. And you have a case that says continuing the litigation, having a favorable... a temporary favorable precedent that sort of allows you to continue the litigation, spend money on lawyers and continue the process, that that alone implicates retroactivity analysis. I'm not saying it doesn't exist. I've just never seen one and I thought maybe you had one. No, I have a case precisely on point that says this is a concern that the court should address. Well, okay, do you have something generally on point? I mean, do you have something that, you know, if you're dealing with liability, you're dealing with out-of-court conduct, stuff that happens outside litigation. Do you have anything that says that implicating litigation costs, expenses, delay, all this stuff, not connected to real-life conduct, that any of that stuff implicates retroactivity? I've just never heard of it. No, but no. But I'm not just saying litigation costs. I'm saying the costs in pursuing his application for adjustment, which the law previously clarified he qualified for. And again, I'd repeat the other point that... I'm sorry, what else have you got on litigation costs? I don't understand. What I said is that him in renewing his application, he also had additional costs in resubmitting applications like I-693. Right. These are sort of litigation costs. Well, they're part of the application. I mean, whether he's applying before the immigration judge or whether he's affirmatively applying before USCIS, it's the same beast there. There's just different expenses for it. And whether he's paying an attorney to present that application... I understand. Just read it very broadly and give me a case that implicates anything like that, anything involving the process of litigation, not the process of real life, not the stuff that happens outside the court or independent of it that sets up the litigation, but the stuff that happens in pursuing the claim administratively or legally. Attorney's fees, filing fees, expert reports, deposition fees, any of that stuff. So give me a case that says that that implicates retroactivity analysis, the fact that you get to spend more money on litigation. It could exist. I'm not saying it doesn't. No, I don't have a case to offer you. Anything close? No, but what I will state, and go back to the first point, is that precisely because the Supreme Court in Beam says that this is a uniform rule, that it has to be either complete prospectivity or complete retroactivity, the court emphasized we don't just look at the party before. So there are... Excuse me. Beam and Harper were looking at judicial opinions under the structure of Chevron Oil. Is there anything similar to that under the chainery to Montgomery Ward administrative agency framework that reaches a similar conclusion? I don't think so. I think partly because Beam and the critique of the partial prospectivity test or selective prospectivity test came after Montgomery Ward. But I think the overarching principle is that this court must announce a rule that applies uniformly to all folks. It's not going to have a selective prospectivity test even in the Montgomery Ward context, even when dealing with an agency determination. So for the companion statute, the little 2i instead of the 1i, we have a case, Morales-Izquierda, where we applied the Torres-Garcia rule to the individual petitioner before the court. Under Jim Beam, Harper, under this framework, then we couldn't revisit the retroactivity of the companion statute, the 2i. I'm sorry. I didn't follow that. You're asking whether under Beam you could... I think those are separate provisions, and so the court has the authority to announce a rule with each provision, but one, of course, is going to directly influence the other because they are so closely related. But are we bound by a Morales-Izquierda application of Torres-Garcia to the petitioner in that case so that we couldn't revisit the retroactivity of that case? We would have one, if we agreed with you, we would say, This is perspective only, but this is also retroactive under Harper and Jim Beam. If I'm following your question, and I apologize, I'm not sure I am, so you're saying that in the context of, as it were, another panel... Well, we have the Juan Gonzalez line of cases, and then we've got the Garcias-Rodriguez line of cases, and they're looking at two similar statutes, correct? Two subsections of the same statute. Right. But in the Juan Gonzalez line of cases, we've already applied the BIA's ruling to the petitioner before the court. So does that preclude us applying a prospectivity-only analysis to that statute? I think if it weren't in an in-bank court, it would be more difficult, but since it is a separate provision, an analysis still can be rendered. But the other point I'd make about... How can we do that because we couldn't affect Mr. Morales-Izquierdo? That was my concern. It's already been applied to him. He's gone. So the point there is that Mr. Morales-Izquierdo was found inadmissible under a separate subsection. Now, obviously, they're very closely related, but this is still a separate subsection. The other point that I make about Morales-Izquierdo is, obviously, it predated this Court's decision in Nunez-Reyes, so it didn't have the benefit of a clarification that even if Morales-Izquierdo was correct and that it still should be treated as a standard judicial interpretation, that that Chevron oil analysis would apply. And so it didn't have the opportunity to go through that. Instead, probably relying on kids like Ditto versus McCard, it found that it must be applied retroactively. You were just out of the timing you wanted, but I was trying to understand what you were saying about this being an unbanked Court. Does that mean that we can overrule Morales-Izquierdo? Certainly. And one of the issues was — Isn't that your answer to the question? That's my primary answer, yes. I just thought in the — But we'd have to do that in order to agree with you. Right. The two cases couldn't lift side by side unless we overruled a recent unbanked decision. That's absolutely correct. I understood it as a hypothetical, a separate panel considering two different issues. But as an unbanked Court, it's now before us directly to consider whether Morales-Izquierdo was correct in finding that it should be treated as any other judicial interpretation and that it must be applied retroactively. Morales-Izquierdo said that ambiguity alone is insufficient to overcome retroactivity. But the Board didn't — The Brandeis scenario is not one of ambiguity alone. The Board wasn't acting in the absence of a clear prior rule. Rather, the Board was asserting its prerogative to disregard this Court's rule and offer an alternative construction. And so even if this Court affirms that it's a reasonable interpretation of an ambiguous statute and affirms the Board's authority to do so, it's still not saying that the Court's prior rule was unlawful. And it's in this fundamental aspect that Brandeis scenario differs from Harper's and Rivers and from the analysis that's laid out in Morales-Izquierdo. Are you planning to save any time for rebuttal? Yes. Thank you. I mean, I'm not saying you should, but — I am. Thank you. Okay. We'll hear from the government. Good morning. May it please the Court. My name is Luis Perez. I am here representing the Attorney General of the United States. Your Honors, first, a quick clarification. The government is not arguing that ACOSTA was not a binding precedent at the time it was issued. The government is arguing that ACOSTA — the study of the size and effect of ACOSTA yielded to Briones, because Briones is the authoritative interpretation of the INA pursuant to Brandeis. Didn't the BIA decline to apply Briones to the Ninth and Tenth Circuits? What the BIA said was that it didn't have to decide that issue in Briones at the time, and the only clue that it gives is that it's a Fifth Circuit case, and then it cites to Brandeis, probably cautiously, perhaps, saying that because the Court hasn't addressed the application of Brandeis in the Ninth Circuit, they simply said that they didn't have to decide the issue. After Briones, didn't the agency continue to apply the ACOSTA rule to cases out of the Ninth Circuit? In some unpublished cases, yes. In other slides, for instance, in the Garfias case, the Board applied Briones even before matter of Diaz-Lopez, because still there was no clarity as to how this Court was going to apply Brandeis in the Ninth Circuit. The point of — But the agency continued to apply ACOSTA, though. Yes. Some unpublished — yes. In some instances, I've done the research, and yes, in some instances, they did apply ACOSTA. Do you know how many? No, I don't know how many, but I can confirm to the Court that that has been the case. However, Diaz-Lopez did clarify the issue. In Mr. Garfias' case, obviously, the Board applied Briones even before Diaz-Lopez. Our reflectivity argument is primarily based on rigors. We are saying that at the time the Board issued its authoritative interpretation in Briones, it was clarifying an unsettled area of the law. Notwithstanding the fact that the Court had expressed a view in ACOSTA, it was not the authoritative interpretation. So the first time the authoritative interpreter spoke was in Briones. This is exactly the reverse situation in the sense that although reverse is premise on the Supreme Court of the United States overruling a court of appeals, okay, and the issue is not so much that the court of appeals interpretation was erroneous. I'm not sure how any of that helps you. If you have a statute that's subject to interpretation by the agency, the agency has primacy if it interprets the statute. But absent interpretation by the agency, when a court is faced with interpretation, it adopts, it can interpret it because the agency hasn't spoken. It doesn't owe any deference because there's nothing to defer to. Right? Correct. And until the agency acts, or unless a superior court acts, or unless the same court acts in bank to change it, that becomes the law of the circuit on that issue. So I don't understand what you gain by saying erroneous or not erroneous or, you know, what is the distinction that you are harping on? How that does you any good or why you're wasting your time talking about it? I'm not getting it. Okay. You're not disputing the Acosta for a while until Briones and perhaps even past Briones, at least until Briones and most likely until the other case you mentioned. Diaz-Lopez. Diaz-Lopez was the law in the Ninth Circuit on this issue. You're not disputing that. I'm saying that up until Briones, it was the law in the Ninth Circuit. It was, and perhaps even past Briones because the board specifically exempted from its rule the Ninth and Tenth Circuits. So really not until Diaz-Lopez, right? I would say that the board did not address, did not decide the question. Okay. So somewhere either Briones or Diaz-Lopez, but it was the law. So I'm not sure why, what the distinction you are drawing, what good it does you. The point is that Briones is the authoritative interpretation of the meaning of the statute pursuant to Brand X. So, counsel, are you saying that because it was clarifying the statute, that there was no need for a retroactivity analysis? Is that your point? Correct. Correct, Your Honor, that there was no change in the law in the reverse sense because this was the authoritative interpreter saying what was the meaning of the law. It's not authoritative when a court construes a statute in the absence of an agency interpretation? Is that unauthoritative? That's how Brand X labeled it, not authoritative, to address Justice Scalia's concern in the dissent. Where Justice Scalia was concerned that the agency were going to be overruling the courts, the majority said no, that's not the case because the court of appeals interpretation was not authoritative. The authoritative interpreter in the context of Chevron Step 2 is the agency. So it seems to be like it all disappears suddenly. I mean, your brief takes the position that it was not authoritative ab initio from the very beginning. But, in fact, as you've acknowledged, the agency itself acceded to it in at least some cases. And so are we supposed to pretend that none of that happened? No, Your Honor. I want to make a distinction between being binding and being authoritative. It is binding, but it's not authoritative. Authoritative is simply a delegate. I don't understand what distinction that is. If it's binding precedent and it is the only source of an explanation at the time as to the meaning of the statute, what isn't authoritative about it? That's how the Supreme Court described it. The way we construe it is that it doesn't have to be overruled in order for it to have a decisive effect to yield to the agency's interpretation. So Brand X analogizes in that same passage to the relationship between a federal court sitting in diversity and a state court's ruling. So the federal court anticipates what the state law would be, and it's binding for people in federal court, but the state court can then decline to follow that. Now, if that were the correct analogy here, we have precedent, the Supreme Court ruled in this case Vandenberg, that there is no retroactivity analysis. You always apply the state law. Are you arguing for that approach? Yes, because there's no change in the law in the sense that the authoritative interpreter, the board, had not spoken before. The board is simply filling an interpretative gap in an unsettled area of the law in the context of Chevron Step 2. So this case is distinguishable from, for instance, Montgomery Ward and the line of cases that precede and postdate Montgomery Ward, where you have a change in position in the agency. Suppose you had an individual, and I realize we have to do it class-wide, but have an individual who actually relies upon what this court says. They come forward and volunteer himself to the agency and try to get relief. So you have actual detrimental reliance. What are we supposed to say to that person? Oops, sorry, never mind? No, I mean, the point is that there was no change in the agency position. All the authoritative interpretations by the agency, Torres-Garcia, we don't have. But even the agency adhered to ACOSTA for a period of time. So how is it that the petitioner is supposed to know that you can't trust the Ninth Circuit if even the agency is trusting the Ninth Circuit, at least for a while? Because the agency can only displace the court's interpretation if it's exercising its Chevron authority. And every time that it has exercised its Chevron authority from Torres-Garcia, then Briones, then Diaz-Lopez, then Lemus-Losa, it has been consistent in what its authoritative interpretation of the interplay is. But what are we to do with situations before the agency speaks? How do we handle those situations? Well, again, we're saying that there's no retroactivity analysis per se, because when the court provides an interpretation, it continues to be an unsettled area of the law in the sense that the agency, that is the authoritative interpreter, hasn't provided a definitive answer to the question. So the solution is to the brand-next problem is negotiate what negotiate states. But what happens then if the BIA never interpreted, issued the Briones opinion? You're saying that the Ninth Circuit law was just there and it could be dispensed with at any time, that the BIA decided, nope, let's disagree with it now, and all these legions of immigrants who had relied on whatever the Ninth Circuit rule was, including changing positions, moving families, more than just what's involved here, any immigration provision that would be subject to brand-next, you're saying that until the BIA speaks, the fact that courts of appeal around the country may be issuing uniform interpretations and immigrants rely on that, then the BIA comes along and says, nope, we have a different take on it, we exercise our authority under brand-next, and too bad, everybody, nobody gets to look at retroactivity, and if you were terribly prejudiced by this, that's what you extract from rivers and from brand-next? That is the outcome in rivers, but there's a much simpler situation for this. First of all, I hope that the board doesn't take a long time. Well, hope is not whether it does or doesn't. But the point that I want to make is that if the court were to apply the negotiated remand rule, when it faces an issue and it identifies that it's an issue of ambiguity in the Chevron Step 2 analysis and remands the case for the board to issue an interpretation, this is the type of situation that would be avoided. I've personally been involved in an opinion where we invited the board to clarify on the mailing rules and the like, and the board ducked it. So are you suggesting that the remedy lies in the courts of appeals saying, well, we know we're just sort of giving advisory opinions here? You're certainly not giving advisory opinions. Non-binding as far as the BIA is concerned, and don't rely upon it. If you out there, anybody else who's listening, because the BIA can come along and we invite the BIA. That's how we're supposed to get that off. I think that the negotiated remand rule is a more sensible rule to avoid this situation of reliance. Now, in this particular case, we have a situation where when ACOSTA was issued, not only had Brandeis had been issued, but also Torres Garcia had been issued. So the people that actually rely on ACOSTA had a notion of how the board looked at the issue in the context of reliance. Now- Mr. Perez, I want to make sure I understand. Are you arguing that our interpretations of any ambiguity in the INA are per se non-authoritative? No. What I'm saying is that when the court finds or holds that there is ambiguity in the INA, that holding of that it is ambiguous, that holding is binding. And even the court's interpretation is binding. But Brandeis says that that interpretation is non-authoritative. That's how Brandeis labels it. And the consequence is not that it's not binding. The consequence is that if the agency were to issue a decision exercising its authority- That's true for the Supreme Court's decision too, and the Supreme Court non-binding too, or non-authoritative? The Supreme Court hasn't decided whether Brandeis applies to itself. Interesting. But Brandeis- But it would follow that it does. Just like the HALIA statute, it is bound by AEDPA just like we are. Excuse me, sir? This is probably out of your field, but presumably it applies to them just as well as to us. Yeah, I mean, they haven't addressed the issue. I read a dissent recently where one of the justices said that they haven't decided the issue as to themselves. But it clearly applies to the court of appeals. Now, in your view, if you have two applicants, and let's say one is files petition before ACOSTA and one after ACOSTA, or perhaps one files an application after ACOSTA and the other one files an application in a different circuit, they didn't have ACOSTA, where there was no interpretation. Your position is that they would be treated the same for the retroactivity analysis. Correct. Because the only thing that counts for the purpose of retroactivity is the board's decision. Correct. Correct. Because the board decision is the authoritative interpretation. The same thing with Rivers. Which is why then it applied to Briones, the actual, to Mr. Briones. Correct. Applied to Mr. Briones. And applied to everyone nationwide except that the board did not decide the issue in terms of the Ninth and the Tenth Circuits. But when the board speaks authoritatively, it speaks nationwide. It's issuing a decision nationwide so that all aliens be treated similarly. Ms. Rayburg, do you have a question? Well, I'm puzzling over whether it, you're good at reading my puzzled face. My question in my own mind, listening to you, is whether the board itself has to engage in a retroactivity analysis, or whether by definition its interpretation of the statute is fictionally considered to have been the way the statute has been from day one. I think that when the board speaks, and it's simply saying what the meaning of the statute is, it has to follow the command on footnote 12 of Rivers that says that in statutory cases, the court have no authority to depart from the congressional command setting the effective date of the law. It is Congress' exclusive authority to say when a law applies. So when the authoritative interpreter is simply saying what the meaning of the law is, it has to. That's the meaning of an issue, and you don't engage in any retroactivity analysis, and neither can a court? That's your position? Well, when we're talking about the first interpretation by the authoritative interpreter. Sometimes there's not just a first. Sometimes the board changes its mind. But that would be a different scenario, Your Honor. I mean, that's a dicier issue, and we are only advocating for a rule when the board speaks for the first time, because it clearly follows the Rivers holding, where in Rivers the Supreme Court said we overrule the Court of Appeals precedent. And also, sir, this is not an instance where the Supreme Court is overruling itself. So we're talking about situations where the authoritative interpreter speaks for the first time. I think there is enough precedent out there to justify the pure retroactive application. And, for instance, Montgomery Ward and the line of cases that follow Montgomery Ward and pervades Montgomery Ward are all based on a changing position by the agency. So clearly Montgomery Ward would not be an appropriate standard in this context, where the agency is speaking for the first time. I'm still having a little bit of trouble with who can interpret the law. I guess, how can Congress grant the agency authority to say what the law is If the Constitution gives us and not Congress the power to interpret the law, isn't that the basic premise in Marbury v. Madison? Yes, Your Honor. However, that was Justice Scalia's concern in the dissent. Every once in a while he's right. But isn't the question that if the law is plain, the Court decides it? And if the agency says, well, it's ambiguous and we do it this way, and the Court then looks at that decision and says, no, you don't have any superior authority because the statute is plain, and the Court then says it, that the Court's view prevails? Well, that's consistent with Grandex. If the statute is unambiguous, then definitely the Court is the authoritative interpreter. Or if the agency makes an unreasonable decision. Correct, but that's not a determination of the Court announcing what the law is. It's simply a determination of whether the agency's announcement was permissible or impermissible. Well, if the Court announces what the law is and the agency says, no, it's something else, it's plain, and the Court says, no, it's plain what we said, that would be the decision. If the agency said, it's ambiguous and here's the way we think it should be construed, and the Court then said that's an unreasonable construction, the Court's determination would be the controlling and authoritative one, wouldn't it? The Court determines. The Court is the authoritative interpreter as to whether or not the statute is ambiguous or unambiguous. But once the Court says that it is unambiguous, it is recognizing that Congress delegated on the agency the authority to fill the interpretative gap. So the agency, for instance, cannot disagree with the Court as to whether or not the statute is ambiguous or unambiguous. Once the Court says it's plain. What about the situation where the Court says the statute is ambiguous, but the agency's interpretation is unreasonable? Yes. It's a question. What about that case? Well, in that case. That's a case where the Court recognizes this is a decision delegated to the agency, much like in Brand X. But in this case, the agency got it wrong. Yes. Within, recognizes it's broad discretion. It's not unlimited. Well, yeah. I mean, the Court has veto power over the agency interpretation because the Court can say, yes, you are the authoritative interpreter, but your interpretation here is impermissible. What happens for purpose of productivity? What then is the, what then becomes authoritative interpretation? There's no authoritative interpretation because the Court just rejected the agency interpretation. But that doesn't make sense if there has been a, I'm sorry. If there, let's take the situation like Acosta. Let's say the circuit has interpreted a statute to mean a certain thing. And the agency later comes in and says, no, it means something else. The Court then holds that's unreasonable. There is a background rule in that scenario. And the background and presumably authoritative rule in that hypothetical is the Court's earlier interpretation because there was one. So I guess I don't understand how we can figure out when the Court is authoritative and when it isn't. I'm still struggling with that. That's the curious thing about Grand X, that when it talks about the Court's interpretation of what the meaning of the law is, it refers to it as not authoritative. And then it says in all other respects the Court interpretation is binding, meaning as to whether or not the statute is ambiguous, meaning as to whether or not the agency's interpretation is permissible or impermissible. But this is why Grand X is a decision that in a way created such a strong dissent from Justice Scalia because it's not the traditional way in which cases are adjudicated. However, this, yes. But it also would seem not to apply across the board. So, Counsel, just so I understand your argument. So if the Court of Appeals said that the decision by the agency was unreasonable and therefore not entitled to deference, what would your view be on whether or not a retroactivity analysis should be conducted? There should be no retroactivity analysis because the area of the law is still uncertain. We don't have an authoritative interpretation that now because the Court has found it to be impermissible, the Court is saying it's wrong. And on the reverse, if an authoritative interpretation is wrong, it's not the law. So why wouldn't the Court's interpretation be authoritative at that point if the interpretation of the agency is impermissible? Because the Court has not been delegated with the authority to fill that interpretative gap in the Chevron Step 2 analysis. So are you saying the Court, the appellate court in that situation, would have to remand to the agency to try again? That would be, yes. I mean, it doesn't have to. I mean, the Court has the authority to provide an interpretation. It's just not an authoritative interpretation. But what I'm saying is that Négoutier prevents the Brandeis problem, prevents the retroactivity problem by having this remand rule. So you're saying that we should say to the agency, look, here's what the law means. You were wrong. Here's how it is. Now we remand to you, and you say you're right, Court. And if you don't say you're right, then we've got to reverse you and remand again until you say it's right. Well, Brandeis is premised on the fact that the Court's best interpretation, best interpretation is not an authoritative interpretation. It's not authoritative until we tell the agency, here's what it means. Now adopt this interpretation. Under Brandeis, that would not be possible because it is not whether or not it is the best interpretation, but whether it is a reasonable interpretation. Suppose we conclude there's no ambiguity under the statute. Excuse me, sir? Suppose we conclude there is no ambiguity under the statute, so there is no alternative interpretation. So in that case, I think Judge Reinhardt's scenario fits. Absolutely correct. If the court says, listen, there is only one possible interpretation, that's a Chevron Step 1 situation. But then you're not in Brandeis' country, right? No, then you're not in Brandeis' country. Then you're in a different country. Correct. You're not in Brandeis' country. But I think Judge Reinhardt was talking about a situation that I was talking about, where the Court says it is delegated to the agency, but the agency is way wrong. And, in fact, now that we look at it, there's only one reasonable interpretation. And this is it. Go ahead and adopt it. Well, if there's only... It happens, you know, out here. It may not happen where you... I think Martínez... Just imagine that. I think Martínez Gutiérrez, the recent Supreme Court case, explains it... It's only the Supreme Court. Huh? It's only the Supreme Court. Congratulations. It's not the BIA or something like that. No, but I think if the Court concludes there is only one possible interpretation, then what the Court is essentially saying is that, listen, Congress answered the precise question here, and this is how Congress has answered it. That's a seven-step-one situation. If you have more than one possible interpretation, you're under seven-step-two territory. I don't understand yet. Let's say, okay, we take Brand X. What we said was not authoritative, didn't preclude the BIA from disagreeing with this. You're saying, therefore, out the window goes any need for retroactivity implications. Why? Because both under Montgomery Ward and Chevron Oil, there's the question of was this a change? Was this foreshadowed? Did people have notice of this? You're saying that doesn't apply because even though for years people followed the circuit law, until the BIA spoke it wasn't authoritative. Where do you read out the need for that kind of retroactivity analysis? I'm relying on Rivers. I mean, Rivers is a situation where you have a Court of Appeals interpretation for years, which is authoritative, but all of a sudden the Supreme Court of the United States says, I'm sorry, Court of Appeals, the interpretation, we disagree with the interpretation, so this is no longer what the law is. The law is what we say the law is, and it is what it has always been. So it's basically the same scenario. The difference is you're equating the Brand X statement about authoritative responding to Justice Scalia as putting the BIA in the same position as the Supreme Court in that context. In the sense that the Supreme Court in the first scenario is the ultimate authoritative interpreter between authoritative interpreters. Here in the Brand X scenario we only have one authoritative interpreter, which is the Board. And can the Supreme Court decide whether or not its authoritative decision is retroactive? In the Rivers context, they said no. They say that they don't have the authority to do that because it would encroach upon Congress's authority to set the effective date of the statute. That's footnote 12 of Rivers. If we adopt realities and say that it does not apply retroactively to Mr. Garfias, do his voluntary departure claims become moot, or what happens? If you apply it to him? I'm sorry. If we adopt realness and say that it does not apply retroactively, I'm just trying to figure out what happens to his voluntary departure. If you apply realness prospectively? Correct. Well, then he is eligible for relief because he would be eligible under ACOSTA. So the issue of voluntary departure is no longer needed. The involuntary departure is a quid pro quo remedy where the alien, in his case, because he filed a petition for review, that is no longer available to him because under the regulation he has been terminated. And the argument we're making before the Court is that the regulation is a permissible exercise of the Attorney General's authority under INA Section 240B-E. So undermine our authority essentially of bribing people not to come to us and seek a review of the agency's decision or coercing. It might be a more, well, they give up an important equity, right? Voluntary departure is an important equity. But according to DADA, it's a quid pro quo equity. It's an equity that is in the nature that it's a benefit for both the alien and the government. So it's like a plea bargain? Yes. I mean, that's how DADA describes it. But the point is that the regulation doesn't prevent the alien from the benefit of voluntary departure because if the alien files the petition for review, even though voluntary departure is terminated, if he leaves within 30 days, he would be deemed as not having left under an order of removal. So it's really a prejudicial review regulation. Within 30 days of what? Excuse me? Within 30 days of what? Of filing the petition for review. Of filing the petition for review. In our court. Correct. The petition for review here. Correct. Congress didn't specifically authorize the BIA to do this. The statute doesn't specifically speak to this. It's a very broad grant of authority. Well, the statute gives the Attorney General a broad end of authority in enacting regulations that limit eligibility for voluntary departure. And by saying that voluntary departure is terminated upon the filing of the petition for review, what the Attorney General is essentially saying is that it's limiting eligibility for those people that do not file petitions for review, with the exception that the regulation still provides for the quid pro quo benefit of allowing the alien to leave within 30 days of filing the petition for review. So we better hurry, decide the case in 29 days or something like that. Well, I mean, the whole point is that in contrast to DADA, where the Supreme Court said that the alien had a Hobson choice between either filing the motion to reopen or enjoying voluntary departure, the regulation is not giving that alien a Hobson choice. The regulation still allows the alien to leave within 30 days of having filed the petition for review and be deemed as having left without being deemed without an order of removal, even without an order of removal. So it's a better remedy than what DADA envisioned. Okay. Thank you. Thank you, Your Honor. Do you have some time left for rebuttal? I believe something like four minutes and four seconds. Yes. Something like that. The Brand X scenario creates enough uncertainty without expanding the legal fiction of asserting that Rivers now means that the agency is somehow declaring what the law has always meant, even though the agency was not acting in the absence of a prior rule, even though the agency is giving an interpretation of What do you make of the word authoritative that Mr. Peres plucks out of Brand X? I think Brand X makes clear that the agency retains the final authority, if it so chooses, to offer an alternative construction to fill in the statutory gaps. But Mr. Peres points to language in Brand X that says the court's interpretation is not authoritative. What do you make of that? I think that's clarifying that even if the court has first spoken to that, establishing the rule, the agency retains the authority to come back. Just like the agency, if it's already spoken to an ambiguous statute, may change its own rule years from now as it sees how that plays out. And as Judge Fischer pointed out, there's no certainty that the agency will speak to the rule. And so the court, as the Supreme Court clarified, its decision remains binding law unless and until the agency asserts its prerogative to choose another construction. Without the agency asserting this authority, the court's interpretation is strong. If you're going through a review process where the agency has authority to disregard the circuit law, how can you say there's any kind of reliance? There's no authoritative interpretation. There's nothing they need to overcome. They just come up with something else. The agency just comes up with a different interpretation. Granted, if this court were now in bank to say that an agency's interpretation really is the authoritative and the sole interpreter and that you can't rely on this court's interpretation, other parties can't look to this court's interpretation for any guidance, and I think that does take away in the future parties. But that's quite different. Saying they can look for guidance as opposed to having the authority is quite different. You can look for guidance in treatises. You can look for guidances in the law of other circuits. You can look for guidance in horn books. You can look for guidance in articles in law reviews. Guidance comes from many places. On the other hand, you can't look and rely on anything because the agency can also change its view. If you know that any decision by any court may be changed or any decision by the agency may be changed, you shouldn't really rely on anything. Well, that may be true, but, of course, as President Costner said, that when the agency interprets it, it's different, and that analysis will be different when the agency changes its mind. But you shouldn't rely on it because that can be changed just as easily. But I think we get out of this problem. It's life itself, you know. We don't know where we're going to get tomorrow morning. I think we escape this by heeding the Supreme Court's instruction that this court's interpretation was not legally wrong, that this court's interpretation was a lawful interpretation, and simply by virtue of the fact that the agency has the authority, if it so desires to change it, does not undermine that ACOSTA declared the law and its meaning from its inception up until this court now, if it recognizes the agency has proffered a reasonable alternative construction. And if the court does recognize this change in the law, then like the retroactivity test applied in Montgomery Ward and by many other circuits, and heeding the guidance of Chenery, should look at whether this abrupt change in the law is going to have an undue impact on Mr. Garfias and similarly situated parties. Without doing that, we're left in the situation where, in St. Cyr, the Supreme Court said elementary considerations of fairness dictate that individuals should have the opportunity to know what the lie is and conform their conduct accordingly. Without recognizing the authority of this court to interpret the law and parties to rely on that, you're undermining the settled expectations. You're upsetting a field where parties have no idea what the law is and can only guess at what the agency may do in the future. And one last point I'd make is, they talk about Brioni's where Matter of Brioni's explicitly declined to assert that it would apply its rule here in the Ninth and also the Tenth Circuits. And this contrasts within a year and a half it came out with the Matter of Armendaris, again in the Fifth Circuit. But there the board said, we're going to assert this interpretation pursuant to Brandeis even in the Ninth Circuit and announce that uniform rule, which is very distinct from the situation at hand. Thank you very much. Case is high. You will stand submitted. Well done.
judges: Kozinski, Reinhardt, Graber, Fisher, Gould, Paez, Rawlinson, Clifton, Bybee, Ikuta, Murguia